1   Robert S. Green (State Bar No. 136183)
    James Robert Noblin (State Bar No. 114442)
2   **GREEN & NOBLIN, P.C.**
    595 Market Street, Suite 2750
3   San Francisco, CA 94105
    Telephone: (415) 477-6700
4   Facsimile: (415) 477-6710
    Email: cand.uscourts@classcounsel.com
5
    Attorneys for Plaintiff
6
    [Additional Counsel Appear on Signature Page]
7

E-filing

FILED
2012 MAR 28 P 3: 39
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8                   **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                          **SAN JOSE DIVISION**

                                                    PSG

                                              CV 12 1558

11  MARY DAVIS, Derivatively on Behalf of Netflix,   Case No.
    Inc.,
12                                                   **VERIFIED SHAREHOLDER**
                        Plaintiff,                   **DERIVATIVE COMPLAINT FOR**
13                                                   **BREACH OF FIDUCIARY DUTY,**
        v.                                           **UNJUST ENRICHMENT, ABUSE OF**
14                                                   **CONTROL, GROSS**
    RICHARD N. BARTON, A. GEORGE BATTLE,             **MISMANAGEMENT, AND WASTE OF**
15  CHARLES H. GIANCARLO, TIMOTHY M.                 **CORPORATE ASSETS**
    HALEY, REED HASTINGS, LESLIE J.
16  KILGORE, ANN MATHER, NEIL D. HUNT,               **JURY TRIAL REQUESTED**
    THEODORE A. SARANDOS, DAVID B.
17  WELLS,

18                      Defendants,

19      and

20  NETFLIX, INC.,

21                      Nominal Defendant.

22          Mary Davis ("Plaintiff"), by and through her undersigned counsel, hereby makes the

23  following allegations in her Verified Shareholder Derivative Complaint (the "Complaint") on behalf

24  of Netflix, Inc. ("Netflix" or the "Company"), as the Nominal Defendant, against the directors (the

25  "Board") and certain senior executives of Netflix. The allegations herein are based upon Plaintiff's

26  personal knowledge as to her own acts, and on information and belief, including the investigation of

27  counsel and review of publicly available information, as to all other matters.

28

**INTRODUCTION**

1.     Netflix is an internet subscription service that delivers television shows and movies to consumers. Subscribers can instantly watch television shows and movies streamed over the internet to their televisions, computers and mobile devices. In the United States, subscribers can also receive standard definition DVDs and Blu-ray discs (collectively, "DVDs") delivered by mail. According to the Company's Form 10-K for the fiscal year ended December 31, 2011, which was filed with the United States Securities and Exchange Commission ("SEC") on February 10, 2012 (the "2011 Form 10-K"), "the Company has three operating segments: Domestic streaming, International streaming and Domestic DVD. The Domestic and International streaming segments derive revenue from monthly subscription services consisting solely of streaming content. The Domestic DVD segment derives revenue from monthly subscription services consisting solely of DVD-by-mail." Netflix "obtain[s] content from various studios and other content providers through streaming content license agreements, DVD direct purchases and DVD revenue sharing agreements."

2.     According to the 2011 Form 10-K, the Company's "core strategy is to grow [its] streaming subscription business domestically and globally." It anticipates "the DVD portion of [its] domestic service will be a fading differentiator to [its] streaming success." As the Company acknowledged in the 2011 Form 10-K, limitations on the availability of content restrict its ability to attract and retain subscribers. The Individual Defendants have been long aware that obtaining the rights to such content is becoming increasingly expensive. Nevertheless, beginning on December 20, 2010, through October 24, 2011 (the "Relevant Period"), the Individual Defendants made or approved materially false and misleading statements about the Company's business practices, its agreements with content providers, and its ability to maintain a stable profit margin, all of which served to inflate artificially the price of the Company's common shares.

3.     At the same time the Individual Defendants were making or approving such materially false or misleading statements, the Board permitted the Company to repurchase over $200 million of its own stock at artificially inflated prices.

4.     Also at the same time the Individual Defendants were making or approving such materially false or misleading statements, seven of the eight Director Defendants (defined below),

1    and all of the Executive Defendants (defined below), were selling their personal shares of Netflix at

2    artificially inflated prices, earning them millions of dollars in ill-gotten profits based on their

3    knowledge of non-public information about the Company.

4        5.    When the truth was revealed about the Company's declining subscriber base, its

5    increasing provider content costs, and its need to change its subscription plans and raise prices, its

6    share price and market capitalization declined dramatically. Shares of Netflix, which closed as high

7    as $298.73 per share on July 13, 2011, closed at $77.37 on October 25, 2011, a decline of nearly

8    75% in barely more than three months.

9        6.    A securities fraud action subsequently was filed on January 13, 2012, accusing a

10   number of Netflix directors and officers of making materially false and misleading statements in

11   violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

12   *City of Royal Oak Ret. Sys. v. Netflix, Inc.*, Case No. 12-cv-225-SC (N.D. Cal.) (the "Securities

13   Fraud Action"). That matter is presently pending.

14       7.    The Individual Defendants (defined below) have consciously and willfully and/or

15   recklessly breached their fiduciary duties of good faith, loyalty, fair dealing and candor, have

16   consciously and willfully and/or recklessly failed to use their utmost ability to control and manage

17   Netflix in a fair, just, honest, and equitable manner, and have unjustly enriched themselves to the

18   detriment of the Company.

19       8.    The Director Defendants have caused the Company to squander irrationally its

20   corporate assets.

21       9.    By virtue of their conduct and the pendency of the Securities Fraud Action based on

22   substantially similar facts as the present matter, among other things, a majority of the Board cannot

23   consider a demand to institute litigation against itself on behalf of the Company with the requisite

24   disinterest and independence.

25       10.   The Company has been damaged as a result of the Defendants' conscious and willful

26   and/or reckless breaches of fiduciary duty and other misconduct.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**JURISDICTION AND VENUE**

2       11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and

3 Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional

4 amount of $75,000, exclusive of interest and costs. This action is not a collusive action designed to

5 confer jurisdiction on a court of the United States that it would not otherwise have.

6       12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because Nominal

7 Defendant Netflix's principal place of business is located in this District. Moreover, a substantial

8 portion of the occurrences complained of herein occurred in this District. In addition, one or more of

9 the Defendants either resides in, or maintain offices in, this District.

10

**INTRADISTRICT ASSIGNMENT**

11       13.     Pursuant to Civil L. R. 3-2(c), (e), this action is properly assigned to the San Jose

12 Division in that a substantial part of the events or omissions which gave rise to the claims asserted

13 herein occurred in Los Gatos, Santa Clara County, California.

14

**THE PARTIES**

15 *Plaintiff*

16       14.     Plaintiff Mary Davis is a current shareholder of the Company, was a shareholder at all

17 times during the Relevant Period, and has been a shareholder of Netflix continuously since that time.

18 Plaintiff is a citizen of New York.

19 *Nominal Defendant*

20       15.     Nominal Defendant Netflix is incorporated in Delaware and maintains its principal

21 executive offices at 100 Winchester Circle, Los Gatos, California 95032. Netflix has been a public

22 company since 2002. Its shares are traded on the NASDAQ under the symbol "NFLX."

23 *Director Defendants*

24       16.     Defendant Richard N. Barton ("Barton") has been a Netflix director since May 2002.

25 According to the Company's 2011 Proxy Statement, filed with the SEC on April 20, 2011 (the

26 "Proxy"), in late 2004, Barton co-founded Zillow, Inc., where he is now Executive Chairman of the

27 Board. Additionally, Barton is a Venture Partner with Benchmark Capital. Previously, Barton

28 founded Expedia, Inc. in 1994 and was its President, Chief Executive Officer ("CEO") and director

1   from November 1999 to March 2003. Barton was a director of InterActiveCorp from February 2003

2   until January 2005. Barton also serves as a director for Avvo, Inc. and Glassdoor.com. Barton was a

3   member of the Board's Nominating and Governance Committee during the Relevant Period. Barton

4   is a citizen of Washington.

5       17.    Defendant A. George (Skip) Battle ("Battle") has been a Netflix director since June

6   2005. According to the Proxy, Battle was previously Executive Chairman of the Board of Ask

7   Jeeves, Inc., which was acquired by IAC/InterActiveCorp in July 2005. He was Chief Executive

8   Officer of Ask Jeeves from 2000 to 2003. From 1968 until his retirement in 1995, Battle served in

9   management roles at Arthur Andersen LLP and then Andersen Consulting LLP (now Accenture),

10  where he became worldwide managing partner of market development and a member of the firm's

11  executive committee. Battle currently serves as Chairman of the Board of Fair Isaac Corporation, a

12  member of the board of the Masters Select family of mutual funds, and as a director of Advent

13  Software, Inc., OpenTable, Inc., and Expedia, Inc. He was previously a director of PeopleSoft, Inc.

14  Battle was a member of the Board's Compensation Committee during the Relevant Period. Battle is

15  a citizen of California.

16      18.    Defendant Charles H. Giancarlo ("Giancarlo") has been a Netflix director since April

17  2007. According to the Proxy, Giancarlo is chairman of the board of directors of Avaya, and serves

18  as a director of Accenture and Skype. Giancarlo also is a Managing Director at Silver Lake, a

19  private equity firm, where he has served since December 2007. Giancarlo held a variety of roles at

20  Cisco Systems, Inc., from 1994 through 2007. Most recently, he was President of Cisco-Linksys,

21  LLC, a position he held since June 2004 and Cisco's Executive Vice President and Chief

22  Development Officer, a position he held since July 2005. From July 2004 to July 2005, he was

23  Chief Technology Officer. Prior to that, Giancarlo was Senior Vice President and General Manager

24  of Product Development, from July 2001 to July 2004. He also served as Senior Vice President and

25  General Manager of the Commercial Business Segment from May 1999 to July 2001, managing one

26  of Cisco's fastest growing business segments. In May 1997, he was appointed to establish Cisco's

27  Global Alliances and ran the division as Senior Vice President until May 1999. In his first Cisco

28  role after joining the company through the acquisition of Kalpana, Inc., Giancarlo held the title of

- 5 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Vice President of Business Development, from December 1994 to May 1997. Giancarlo was a

2  member of the Board's Audit Committee during the Relevant Period. Giancarlo is a citizen of

3  California.

4         19.    Defendant Timothy M. Haley ("Haley") has been a Netflix director since June 1998.

5  According to the Proxy, Haley is a co-founder of Redpoint Ventures, a venture capital firm, and has

6  been a Managing Director of the firm since October 1999. Haley has been a Managing Director of

7  Institutional Venture Partners, a venture capital firm, since February 1998. From June 1986 to

8  February 1998, Haley was the President of Haley Associates, an executive recruiting firm in the high

9  technology industry. Haley currently serves on the board of directors of several private companies.

10  Haley was Chairman of the Board's Compensation Committee and a member of the Board's Audit

11  Committee during the Relevant Period. Haley is a citizen of California.

12        20.    Defendant Reed Hastings ("Hastings") has been CEO of Netflix since September

13  1998 and Chairman of the Board since the Company's inception in 1997. He has also been President

14  of the Company since 2000. According to the Proxy, Hastings served as CEO of Pure Atria

15  Software, a maker of software development tools, from its inception in October 1991 until it was

16  acquired by Rational Software Corporation, in August 1997. Hastings currently serves as a member

17  of the board of directors of Microsoft. Hastings is a defendant in the Securities Fraud Action.

18  Hastings is the sole member of the Board's Stock Option Committee. Hastings is a citizen of

19  California.

20        21.    Defendant Jay C. Hoag ("Hoag") has been a Netflix director since June 1999.

21  According to the Proxy, since June 1995, Hoag has served as a founding General Partner at

22  Technology Crossover Ventures, a venture capital firm. Hoag serves on the board of directors of

23  Tech Target and several private companies. Previously Hoag served on the boards of directors of

24  TheStreet.com, Altiris, Inc., Expedia, Inc. and eLoyalty Corporation. Hoag was Chairman of the

25  Board's Nominating and Governance Committee and a member of the Compensation Committee

26  during the Relevant Period. Hoag is a citizen of California.

27        22.    Defendant Leslie J. Kilgore ("Kilgore") has been a Netflix director since January

28  2012. According to a Form 8-K filed by the Company with the SEC on January 20, 2012, and its

- 6 -

1  accompanying press release, Kilgore was Netflix's Chief Marketing Officer from 2000 until
2  February 2, 2012. Kilgore is a defendant in the Securities Fraud Action. Kilgore is a citizen of
3  California.

4       23. Defendant Ann Mather ("Mather") has been a Netflix director since July 2010.
5  According to the Proxy, since September 2005, Mather has been a director of Glu Mobile Inc., a
6  publisher of mobile games, and serves as chair of its audit committee. Since November 2005, Mather
7  has been a director of Google, Inc. and serves as chair of its audit committee. Since May 2010,
8  Mather has been a director of MoneyGram International, a global payment services company, and
9  serves as chair of its audit committee. Since December 2010, Mather has been a director of MGM
10 Holdings Inc., the independent, privately-held motion picture, television, home video, and theatrical
11 production and distribution company, Inc. Mather is also a director of Ariat International, Inc, a
12 privately held manufacturer of footwear for equestrian athletes. Mather was previously a director of
13 Central European Media Enterprises Group, a developer and operator of national commercial
14 television channels and stations in Central and Eastern Europe, Zappos.com, Inc., a privately held,
15 online retailer, until it was acquired by Amazon.com, Inc. in 2009, and Shopping.com, Inc., a price
16 comparison web site, until it was acquired by eBay Inc. in 2005. Mather was chair of
17 Shopping.com's audit committee, and a member of its corporate governance and nominating
18 committee. From 1999 to 2004, Mather was Executive Vice President and Chief Financial Officer
19 ("CFO") of Pixar, a computer animation studio. Prior to her service at Pixar, Mather was Executive
20 Vice President and CFO at Village Roadshow Pictures, the film production division of Village
21 Roadshow Limited. From 1993 to 1999, she held various executive positions at The Walt Disney
22 Company, including Senior Vice President of Finance and Administration for its Buena Vista
23 International Theatrical Division. Mather was Chairman of the Board's Audit Committee during the
24 Relevant Period. Mather is a citizen of California.

25 *Executive Defendants*

26      24. Defendant Neil D. Hunt ("Hunt") has served as the Company's Chief Product Officer
27 since 2002 and as its Vice President of Internet Engineering from 1999 to 2002. Hunt is a defendant
28 in the Securities Fraud Action. Hunt is a citizen of California.

- 7 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

25.     Defendant Theodore A. Sarandos ("Sarandos") has served as the Company's Chief Content Officer and Vice President of Content since 2000. Sarandos is a defendant in the Securities Fraud Action. Sarandos is a citizen of California.

26.     Defendant David B. Wells ("Wells") has served as the Company's CFO since December 2010 and its Vice President of Financial Planning & Analysis from August 2008 to December 2010. He held the position of Director of Operations Planning & Analysis from March 2004 to August 2008. Wells is a defendant in the Securities Fraud Action. Wells is a citizen of California.

27.     The Defendants described in paragraphs 16-23 above are referred to herein as the "Director Defendants."

28.     The Defendants described in paragraphs 24-26 above are referred to herein as the "Executive Defendants."

29.     The Defendants described in paragraphs 16-26 above are referred to herein collectively as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     The Individual Defendants, because of their positions of control and authority as directors or officers of the Company, were able to and did, directly and indirectly, control or fail to control the wrongful acts complained of herein. Because of their directorial and executive positions with the Company, each of the Individual Defendants had access to adverse non-public information about the financial condition and operations of the Company, including, without limitation, the misconduct of the other Individual Defendants.

31.     At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of said agency.

32.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of the Company. By virtue of such duties, the officers and directors of the Company were required, among other things, to:

a. Manage, conduct, supervise and direct the business affairs of the Company in accordance with the laws of the United States, the states in which it conducted business, and the Company's charter and bylaws;

b. Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors, and employees of the Company from violating or acting in contravention to applicable federal and state laws, rules and regulations; and

c. Refrain from using their status as directors or officers to the detriment of the Company and its shareholders.

33. Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and board meetings and committees thereof and via reports and other information provided to them in connection therewith.

34. As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ during the Relevant Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

35. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, press releases, and other communications complained of herein and were aware of, or deliberately or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of, or deliberately or recklessly

- 9 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   disregarded, their materially false and misleading nature.  Because of their Board membership and/or

2   executive and managerial positions with Netflix, each of the Individual Defendants had access to the

3   adverse undisclosed information about Netflix's business prospects and financial condition and

4   performance as particularized herein and knew, or recklessly disregarded, that these adverse facts

5   rendered the positive representations made by or about Netflix and its business issued or adopted by

6   the Company materially false and misleading.

7       36.     The members of the Audit Committee, Director Defendants Giancarlo, Haley, and

8   Mather, had additional duties to the Company by virtue of their positions, which they were required

9   to exercise with loyalty and in good faith.  According to the Committee's charter, it is responsible

10  for, among other things, "provid[ing] oversight and monitoring of (i) the Company's financial

11  reporting process (ii) the Company's systems of internal controls over financial reporting, [and] (iii)

12  the integrity of the Company's financial statements," as well as "assist[ing] the Board in ensuring the

13  Company's compliance with legal and regulatory requirements in connection with the Company's

14  financial reporting process."  In particular, the Committee is charged with, among other things,

15  "Providing oversight and monitoring of the activities of Company management, including without

16  limitation, the chief financial officer and principal accounting officer and controller, and the

17  independent auditors with respect to the Company's financial reporting and compliance process;

18  Reviewing on a continuing basis the adequacy and effectiveness of the Company's system of

19  internal controls over financial reporting as well as the Company's disclosure controls and

20  procedures; Directing the Company's independent auditors to review before filing with the [SEC]

21  the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using

22  professional standards and procedures for conducting such reviews; Reviewing before release the

23  unaudited quarterly and audited annual operating results in the Company's quarterly and annual

24  earnings releases; Reviewing with management, before release, the audited financial statements and

25  Management's Discussion and Analysis included in the Company's Annual Report on Form 10-K,

26  and recommending to the Board following such review, if appropriate, that the audited financial

27  statements be included in such Annual Report on Form 10-K;" and "*If necessary, instituting special*

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    *investigation(s) and, as appropriate, hiring special counsel or experts to assist in such*

2    *investigation(s)."* (emphasis added).

3         37.    Each of the members of the Audit Committee violated their duties as members of that

4    committee in that they utterly failed to implement and oversee in good faith, and with loyalty,

5    adequate internal controls sufficient to monitor and prevent the officers, directors and employees of

6    Netflix from violating or acting in contravention to applicable laws, rules and regulations and/or

7    intentionally and/or recklessly failed to detect and/or encouraged and/or aided and abetted

8    misconduct by the Individual Defendants.    They also drafted, produced, reviewed, and/or

9    disseminated the material false and misleading statements and information alleged herein and/or

10   were aware, or recklessly disregarded, that material false and misleading statements were being

11   issued regarding the Company during the Relevant Period.  In addition, they intentionally, willfully,

12   and/or recklessly failed to initiate a special investigation into the misconduct by the Individual

13   Defendants (including their own misconduct).

14                          **SUBSTANTIVE ALLEGATIONS**

15        38.    Netflix's original business consisted almost exclusively of the distribution of DVDs

16   to its subscribers by mail.  Since then, it evolved to become primarily an internet subscription service

17   that streams television shows and movies to its subscribers' televisions, computers, and mobile

18   devices.  According to the 2011 Form 10-K, the Company obtains content from various providers

19   "through streaming content license agreements, DVD direct purchases and DVD revenue sharing

20   agreements."

21        39.    Netflix's survival is contingent upon having sufficient content available to its

22   subscribers. The Company has faced increasing competition, according to the 2011 Form 10-K,

23   from "Multichannel video programming distributors (MVPDs) with free TV Everywhere

24   applications such as HBO GO or Showtime Anytime, and VOD (video-on-demand) content

25   including cable providers, such as Time Warner and Comcast; 'Over-the-top' Internet movie and TV

26   content providers, such as Apple's iTunes, Amazon.com's Prime Video, Hulu.com and Hulu Plus,

27   LOVEFiLM and Google's YouTube; DVD rental outlets and kiosk services, such as Blockbuster

28   and Redbox; [and] Entertainment video retailers, such as Best Buy, Wal-Mart and Amazon.com."

40.     In October 2008, Netflix announced a partnership with Starz Entertainment, LLC to stream what would eventually include a selection of over 2,500 movies and television shows in a service known as "Starz Play." Netflix paid approximately $30 million to obtain streaming rights to Starz content. Netflix also acquired the rights to stream content from a number of other providers during the Relevant Period, including ABC.

41.     On January 26, 2011, Netflix announced its financial results for the quarter and the year ended December 31, 2010. Individual Defendants Hastings and Wells issued a letter to Netflix shareholders dated January 26, 2011, that was included as an exhibit to a Form 8-K filed with the SEC that day. For the fourth quarter of 2010, the Company reported net income of $47 million, or diluted earnings per share of $0.87. It projected net income between $49 million and $62 million fo the first quarter of 2011, and earnings per share between $0.90 and $1.13. For the upcoming year, it expected a domestic operating margin of approximately 14%, a figure it would cling to repeatedly, and large additions to the number of subscribers.

42.     The letter stated that the Company surpassed 20 million subscribers on December 31, 2010. They claimed that "[m]ore subscriber growth enables us to spend more on streaming content, making the Netflix service even better in 2011." They also presented the following business model:

> We think our subscriber growth in any given geography will follow the 'S' curve of adoption, and we are excited to still be in the accelerating phase of the 'S' curve today. We expect three phases: (a) a period of increasing net additions (seasonally adjusted); then (b) a period of steady net additions; and then finally (c) a period of shrinking net additions until the subscriber base growth slows to follow GDP and population growth. We are working hard to improve our service rapidly enough to stay in the first phase for as long as possible.

> In November last year we introduced our $7.99 per month pure streaming plan, and we increased the prices on our combination plans, which include streaming and unlimited DVD rentals. As you can see from our strong Q1 subscriber guidance, our pure streaming plan has a great deal of consumer appeal. More than one third of new subscribers are signing up for the pure streaming plan, and we expect that percentage to grow over time. The balance of new subscribers primarily takes our $9.99 1-DVD combination plan. Very few of our existing subscribers are downgrading to the pure streaming plan.

> Our three virtuous cycles of subscriber growth are:

>       1.     More subscribers means more money to license content with, *which drives more subscriber growth*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

       2.     More subscribers means more word-of-mouth from subscribers to those who are not yet subscribers, *which*

2

*drives more subscriber growth*

3

       3.     More subscribers means we can increase R&D spend to improve our user experience, *which drives more subscriber*

4

*growth*

5

You can see the power of these virtuous cycles in our marketing spend in Q4: we

6

spent about 10% fewer dollars in marketing than one year ago, yet subscribers grew 63% over the last year. At the end of Q4, about 9% of subscribers were active free trials. This is more than we've ever had before, due to the expanded use of one

7

month free trials over two week free trials, and to strong growth in December. We expect the percentage of subscribers in active free trials will be less in Q1 than Q4,

8

because Q1 growth is front-loaded rather than back-loaded.

9

(Emphasis in original).

10

       43.     Director Defendant Hastings had previously discussed the "S Curve" model in a

11

December 20, 2010, response to a *Seeking Alpha* article by Whitney Tilson.  He said:

12

Next in the litany of Whitney threats is market saturation. In 2011, this is unlikely to

13

affect us. Streaming is growing rapidly; it is propelling Hulu, YouTube, Netflix and others to huge growth rates. Streaming adoption will likely follow the classic S curve, and we're still on the first part (acceleration) of the S curve. Since we

14

expanded into streaming, Netflix net subscriber additions have been 1.9m in 2008, 2.9m in 2009, and over 7m this year (estimated). While saturation will happen

15

eventually, given the recent huge acceleration of our business specifically, and streaming generally, saturation seems unlikely to hit in the short term.

16

       44.     Director Defendant Hastings went on in the response to the Tilson article to discuss

17

the relationship between revenue and content acquisition.  He wrote:

18

Moving on to the widely-discussed issue of increased content costs, it is true that we

19

are paying more for any given piece of content that we were two years ago, and that in two years, we'll pay more than we pay today. Part of our goal as a business is to

20

make money for content producers and to become one of their largest and best revenue sources. Fortunately, our subscriber base is growing fast enough, and DVD

21

shipments are growing slow enough, that we can afford to pay for the existing streaming content we have, and also get more content. We try not to comment on

22

specific deals, like the Starz renewal, as that rarely helps us get deals done.

23

Investors sometimes see the content cost threat as an issue around our margins. But

24

we have no intention of overspending relative to our margin structure, and there is no specific content that we "must have" at nearly any cost. In our domestic business we

25

spend 65-70% of revenue on COGS [Cost of Goods Sold] (which is mostly content and postage). So if content costs rose faster than we expected, then in practice we'd

26

have less content than otherwise, rather than less margin. This would ultimately show up in less subscriber growth than we wanted from a not-as-good-as-it-would-

27

otherwise-be service; it would not likely show up as a sudden hit to margins. Management at Netflix largely controls margins, but not growth.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    45.    Director Defendant Hastings concluded his response with a warning to investors who

2    doubted the Company's prospects.  He said:

3        To wrap up, I have to agree with my friend Whitney that there are many risks ahead
         for Netflix, that our valuation is substantial, and that it is possible that one could
4        make money shorting Netflix today. But shorting a market leading firm as it is
         driving a huge new market is a very gutsy call. On balance, I would rather have my
5        co-philanthropists on the long side of this particular bet.

6    46.    The next day, December 21, 2010, the price of Netflix common shares increased by

7    $8.19 per share, or over 4%, to close at $186.24.

8    47.    In their January 26 letter to shareholders, Individual Defendants Hastings and Wells

9    had more to say about content costs and operating margins.  Specifically, they stated:

10       Managing to a target operating margin has proven to be effective for us, and we plan
         to continue to do so. For the next few quarters we will target a domestic operating
11       margin of about 14%, which we believe is a good balance of growth and earnings.
         The variable costs of DVD shipments, and the seasonal nature of big DVD releases,
12       contributed to material expense seasonality in the past. While this remains true of
         DVD, this expense seasonality will smooth out as streaming becomes the majority of
13       our content expense. Seasonality of subscriber growth will remain, but the domestic
         margin structure going forward should be less seasonal than in the past.
14       Occasionally, we will have the opportunity to close a big streaming content deal, and
         our margins will dip temporarily, but most of the streaming deals are less lumpy, and
15       we will be able to manage close to the domestic 14% target.

16   48.    Individual Defendant Hastings was asked during a conference call with investors

17   regarding the Company's fourth quarter and year-end results to discuss its prospects for acquiring

18   content from "major Hollywood studios."  He replied:

19       [N]o, it's not gotten harder, *it's gotten easier as we pay more*. Three, four years ago,
         when we couldn't spend much, it was very hard, and, now because we've got
20       significant dollars to spend, we've got people coming to us and that makes perfect
         sense. So . . . we're feeling great about both our ability to make content owners a lot
21       of money and to get deals done and continue to fill out and improve our selection.

22   (Emphasis added).

23   49.    Netflix filed its Form 10-K for 2010 with the SEC on February 18, 2011.  The Form

24   10-K continued the ongoing discussion about the Company's margins, stating:

25       If we are unable to secure and maintain rights to streaming content or if we cannot
         otherwise obtain such content upon terms that are acceptable to us, our ability to
26       stream TV shows and movies to our subscribers will be adversely impacted, and our
         subscriber acquisition and retention could also be adversely impacted. As streaming
27       content license agreements expire, we must renegotiate new terms which may not be
         favorable to us. If this happens, the cost of obtaining content could increase and our
28       margins may be adversely affected. As we grow, we are able to spend an increasingly

- 14 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

larger amount for the licensing of streaming content. We believe that the streaming content we make available to our subscribers is sufficiently diversified, such that we will not be forced to pay licensing fees for content in excess of our desired operational margins. We believe that any failure to secure content will manifest in lower subscriber acquisition and retention and not in materially reduced margins. Nonetheless, given the multiple-year duration and largely fixed nature of content licenses, if we do not experience subscriber acquisition and retention as forecasted, our margins may be impacted by these fixed content licensing costs. During the course of our license relationship, various contract administration issues can arise. To the extent that we are unable to resolve any of these issues in an amicable manner, our relationship with the studios and other content distributors or our access to content may be adversely impacted.

50.     This statement did not acknowledge what Individual Defendant Hastings had said previously: the Company was already paying more for its streaming content.

51.     On April 25, 2011, the Company filed a Form 8-K with the SEC that included as an exhibit a letter to shareholders signed by Individual Defendants Hastings and Wells on that date announcing its results for the first quarter of 2011. The Company reported net income of $60 million, or $1.11 diluted EPS, on revenue of $718 million. It predicted net income of $50 million to $62 million in the second quarter of 2011, earnings per share of $0.93 to $1.15, and an increase in domestic subscribers of approximately 2 million.

52.     The letter once again promoted the S Curve virtuous cycle and the Company's 14% domestic operating margin mantras:

We were thrilled to add 3.3 million domestic subscribers in Q1, nearly double the number added in Q1 of 2010. The virtuous cycle we've mentioned previously of increased investment in streaming content, strong word of mouth and an expanding device ecosystem truly worked for us in the quarter. In addition, we spent record amounts marketing Netflix, per the margin discussion below.

Looking forward, our prior period comps for net adds are going to get tougher, and while we expect our net adds the rest of this year to continue to exceed those of the prior year, it won't be at a pace of nearly 2X like in Q1. With net adds forecast to grow every quarter on a Y/Y basis, we remain in the first half of the S curve of adoption. As always, we will remain focused on improving our service, keeping Netflix in the first half of the curve, and thereby increasing Y/Y net adds, as long as possible.

Our pure streaming plan and a price increase on our hybrid offerings were put into place in November 2010, and the price increase largely took effect in Q1. As a result, our average subscription price increased sequentially from Q4 to Q1. During the quarter, new subscribers embraced the pure streaming and hybrid plans in roughly equal numbers. Going forward, we believe the ASP trend will revert back to slight Q/Q decline as pure streaming becomes a larger part of the overall subscriber mix.

***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

As streaming grows, TV shows and feature films are being enjoyed in nearly equivalent volume by our subscribers and our content acquisition team is focusing their attention accordingly. We've recently added lots of new TV episodes, and the profile and completeness of the shows continues to improve. As for movies, we've recently added a large number of core catalog titles from Paramount that are exclusive to Netflix against broadcast, cable and other over-the-top services and titles from Lionsgate and MGM that are exclusive against other over-the-top services.

While the size of these deals and their impact on our P&L [Profit & Loss] is often speculated about in the press, spending typically takes place over multiple years and the amortized cost of these deals is taken into consideration in our 14% target operating margin model.

53.     During a conference call with analysts to discuss the first quarter results, Individual Defendant Hastings reaffirmed the 14% operating margin goal, regardless of costs, stating "We'll run the U.S. around 14% operating margin and spend on content in accordance with that."

54.     At a conference on June 1, 2011, Individual Defendant Wells was asked by an industry analyst "how are you able to manage your financial goals when you're adding, and manage to a long-term operating margin even as you add so much new spend in a new area that really, until January, you didn't have a direct product for?" He replied:

I'd say that the discipline that we're holding to for this year is to hold to a 14 – around a 14% domestic operating margin target. And the numbers that you see in the press, some accurate, some not, are indicative of the total value of a deal. So it it's a three-year-deal or a five-year-deal, it's going to be the total value of that deal. It isn't the P&L expense that we would see in any given year or quarter, and so it's going to be a fraction of that. And so to the extent that we're holding to a content budget, the deals we're making, I can assure you, are still well within the expectations of our operating margin targets.

55.     At the time Individual Defendants Hastings and Wells made their comments, the Company was facing a growing chorus of skeptics about its growing content expenses and its ability to maintain its targeted operating margin. For example, on April 26, 2011, Wall St. Cheat Sheet said:

We expect  streaming content costs to increase by at least $500 million in 2011. We estimate that the cost of streaming content deals has risen from around $180 million in 2010 to a likely case of $1.975 billion in 2012. Netflix has not confirmed financial terms of studio deals, but it is clear that streaming costs will rise significantly in the near future, more than offsetting declining fulfillment, marketing, DVD purchase and postage expenses.

George Askew of Stifel Nicolaus said on April 25 that "content expense and marketing costs should rise in 2011, undermining margins."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

56.    On July 12, 2011, Netflix announced a radical change to its pricing policy.  It eliminated its unlimited plans that included both streaming and DVDs by mail.  Under the new plan, customers could choose unlimited streaming for $7.99 per month; or unlimited DVDs, one DVD out-at-a-time for $7.99 per month, or two DVDs out-at-a-time for $11.99 per month, with a $2 per month Blu-ray surcharge, and no streaming.   Previously, Netflix had charged $9.99 for a combination streaming and DVD package.  The same package would now cost $15.98.

57.    Netflix's new pricing plan set off a storm of angry protests from its customers.  As CNET.com reported on July 13, 2011, "Netflix finds itself awash in angry comments, which are appearing on Facebook, Twitter, the company's own blog and even on newly created Web pages, as ticked-off subscribers rip Netflix on this issue."

58.    Netflix explained the price increase as follows:

> Why the changes? Last November, when we launched our $7.99 unlimited streaming plan, DVDs by mail was treated as a $2 add on to our unlimited streaming plan. At the time, we didn't anticipate offering DVD only plans. Since then we have realized that there is still a very large continuing demand for DVDs both from our existing members as well as non-members. Given the long life we think DVDs by mail will have, treating DVDs as a $2 add on to our unlimited streaming plan neither makes great financial sense nor satisfies people who just want DVDs. Creating an unlimited DVDs by mail plan (no streaming) at our lowest price ever, $7.99, does make sense and will ensure a long life for our DVDs by mail offering.

59.    According to a blog by David Pogue in the *New York Times* published on July 14, 2011, "I've read [Netflix's explanation] five times, but I have no idea what that means. How does a 60 percent price hike 'ensure a long life for our DVDs by mail'? Does it mean they'll buy more discs? Use thicker shipping envelopes?"  The Pogue blog reported that Netflix claimed "[t]he new studio contracts have nothing to do with the price change."  CNET.com, however, noted  in its report, "The costs of content are going up for Netflix as the six top Hollywood movie studios have begun to play hardball."

60.    On July 13, 2011, Netflix announced a multi-year content agreement with NBCUniversal.

61.    Investors were pleased with the pricing decision and the NBC Universal agreement. Shares of Netflix closed at $298.73 on July 13, 2011, up $7.46 from the previous day.  It was a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   record high price for Netflix shares, and the highest price it would close at again during the Relevant

2   Period.

3          62.     On July 25, 2011, the Company filed a Form 8-K with the SEC that included as an

4   exhibit a letter to shareholders signed by Individual Defendants Hastings and Wells on that date

5   announcing its results for the second quarter of 2011. The Company reported net income of $68

6   million, or $1.26 diluted earnings per share. It predicted net income of $39 million to $58 million in

7   the third quarter of 2011, with earnings per share between $0.72 and $1.07, steep declines from the

8   previous quarter. The letter noted that Netflix had over 25 million global subscribers at the end of

9   the quarter, and "with the recently introduced price changes, we'll be able to further increase the

10  scope and quality of our streaming content." The letter conceded that in the third quarter of 2011,

11  the Company would experience a slowdown in new subscribers and would "only [see] the negative

12  impact of the pricing change," but by the fourth quarter "we expect domestic net additions to return

13  to a pattern of year-over-year growth while revenue will reflect a full quarter's impact of the pricing

14  changes, which could result in Q4 being our first billion dollar global revenue quarter, driven by

15  strong U.S. performance." Once again, the letter emphasized the Company's 14% domestic

16  operating margin: "While we expect our revenue to increase in Q4 from this pricing change, we are

17  still targeting a 14% domestic operating margin because we will continue to increase our spending

18  on streaming content, ensuring the service remains by far the best value out there when it comes to

19  enjoying instant, on-demand movies and TV shows."

20         63.     On September 1, 2011, Starz announced it would not renew its distribution deal with

21  Netflix when it expired at the end of February 2012. The decision meant that Netflix's ability to

22  stream content from Sony and Disney would be severely limited. Starz stated "[t]his decision is a

23  result of our strategy to protect the premium nature of our brand *by preserving the appropriate*

24  *pricing and packaging of our exclusive and highly valuable content.*" (emphasis added). Netflix

25  tried to downplay the significance of the announcement, claiming:

26          While Starz was a huge part of viewing on Netflix several years ago because it was
            some of the only mainstream content Netflix offered, over the years Netflix has spent
27          more and more licensing great TV shows from all four broadcast networks and many
            cable networks, and we have licensed 1st run movies from Relativity, MGM,
28          Paramount, Lionsgate and others. Because we've licensed so much other great

- 18 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

content, Starz content is now down to about 8% of domestic Netflix subscribers' viewing. As we add even more content in Q4, we expect Starz content to naturally drift down to 5-6% of domestic viewing in Q1. We are confident we can take the money we had earmarked for Starz renewal next year, and spend it with other content providers to maintain or even improve the Netflix experience.

64.   Investors were not impressed with Netflix's explanation; it was apparent the Company could not afford to renew its agreement with Starz. Its shares closed at $233.27 per share on September 1, 2011. The announcement came after the market closed. The next trading day, September 2, its shares fell $20.16 to close at $213.11 per share.

65.   On September 15, 2011, the Company filed a Form 8-K with the SEC including as an exhibit a letter to shareholders signed by Individual Defendants Hastings and Wells lowering its prior subscriber estimates for the third quarter. The Company was now anticipating 200,000 fewer streaming customers and 800,000 fewer DVD customers than originally anticipated. Despite these numbers, the Company remained defiant. The letter said "We know our decision to split our services has upset many of our subscribers, which we don't take lightly, but we believe this split will help us make our services better for subscribers and shareholders for years to come."

66.   Shares of Netflix closed at $205.42 on September 14, 2011. · The September 15 announcement was made prior to the opening of trading. The price of Netflix shares dropped $39.46, nearly 19%, on September 15, 2011, to close at $169.25.

67.   Another shock was just around the corner.  On September 19, the Company announced it was separating its streaming and DVD segments, retaining the Netflix name for the former and renaming the latter "Qwikster." Customers wishing to use the DVD service would now have to use a separate web site, have a separate password, and would be billed separately, among other things. Reaction was fiercely negative. Entertainment News called the move a "debacle" on September 20.

68.   Netflix shares, which closed at $155.19 on September 16, 2011, the previous trading day, lost $11.44 to close at $143.75 on September 19. On September 20, Netflix shares lost an additional $13.72 to close at $130.03.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

69.   On October 10, 2011, the Company abandoned its plans to separate out its DVD business under the Qwikster name.  On October 11, the Wall Street Journal called the Qwikster episode "embarrassing" and compared it to the 1985 "New Coke" disaster.

70.   On October 24, 2011, the Company filed a Form 8-K with the SEC that included as an exhibit a letter to shareholders signed by Individual Defendants Hastings and Wells on that date announcing its results for the third quarter of 2011.  The letter admitted that the "last few months . . . have been difficult for shareholders, employees, and most unfortunately, many members of Netflix. . . . [W]e greatly upset many domestic Netflix members with our significant DVD-related pricing changes, and to a lesser degree, with the proposed-and-now-cancelled rebranding of our DVD service. In doing so, we've hurt our hard-earned reputation, and stalled our domestic growth. . . . We compounded the problem with our lack of explanation about the rising cost of the expansion of streaming content, and steady DVD costs, so that absent that explanation, many perceived us as greedy."

71.   The letter revealed that "[u]nique domestic subscribers declined to 23.8 million subscribers, driven both by a higher than expected level of cancellations and a reduction in acquisitions driven by the PR storm that engulfed our brand and its impact on word-of-mouth." According to the financial summary included in the letter, the Company lost approximately 800,000 subscribers during the third quarter of 2011.  The letter lowered the Company's revenue and profit projections for the fourth quarter of 2011.

72.   The October 24, 2011 Form 8-K with the letter to shareholders was filed after the market closed.  Shares of Netflix common stock closed at $118.84 that day.  The next trading day, October 25, 2011, Netflix shares lost $41.47 to close at $77.37 per share on extremely heavy volume.  The "virtuous cycle" had been broken.

73.   On October 27, 2011, the Company filed its Form 10-Q for the third quarter with the SEC.  It reported income of $62.2 million, down from $68 in the previous quarter, and diluted EPS of $1.16, down $0.10 from the previous quarter.  The Form 10-Q also revealed that the Company's streaming content obligations were nearly $3.5 billion, up nearly $1 billion in the previous three months.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

2      74.    The statements described above made prior to October 27, 2011, were improper when

3  made because the Individual Defendants failed to disclose or affirmatively misrepresented material

4  adverse facts.  Such failures to disclose or affirmative misrepresentations were intentional, in

5  conscious disregard of the truth, and/or in reckless disregard of the truth.  The reasons why the

6  aforesaid statements were improper include:

7      (a)    The Individual Defendants knew the Company's costs for streaming content was

8  increasing and would continue to increase dramatically in the very near future, leaving it with the

9  choice, as the Starz example demonstrated, of losing content, or paying more for content;

10     (b)    In order to maintain projected domestic operating margins, the Company would have

11  to raise prices, causing a loss of subscribers, and breaking the "virtuous cycle;" and

12     (c)    These events made Netflix's earnings forecasts for 2011 unrealistic and unattainable.

13     75.    The statements described above, and the failure to prevent or correct the statements

14  described above, constituted breaches of the Individual Defendants' duties of loyalty, good faith, fair

15  dealing and candor.

16     76.    The Individual Defendants' failures to disclose and affirmative representations

17  resulted in the price of the Company's shares being traded at artificially inflated prices during the

18  Relevant Period.

19     77.    The Individual Defendants, except for Individual Defendant Mather, used their

20  knowledge of adverse non-public information about the financial condition and operations of the

21  Company, as well as the affirmative misrepresentations and failures to disclose, for their personal

22  benefit, and to the detriment of the Company and its shareholders.  During the Relevant Period these

23  Individual Defendants sold large amounts of personally-owned Netflix stock at artificially inflated

24  prices and reaped enormous profits thereby.  The following chart summarizes the extent of the

25  Individual Defendants' self-dealing during the Relevant Period:

26

| Individual Defendant | Number of Shares Sold | Proceeds |
|---|---|---|
| Director Defendants | | |
| Barton | 9,620 | $ 2,613,561.60 |
| Battle | 7,500 | $ 1,942,890.00 |

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | |
|---|---|---|
| Giancarlo | 24,839 | $ 5,830,429.37 |
| Haley | 20,398 | $ 4,309,689.44 |
| Hastings | 190,000 | $43,252,600.00 |
| Hoag | 24,122 | $ 5,555,067.66 |
| Kilgore | 29,577 | $ 7,069,803.04 |
| Mather | 0 | $0 |
| | 306,056 | $70,574,041.11 |
| Executive Defendants | | |
| Hunt | 35,589 | $ 8,311,798.17 |
| Sarandos | 25,360 | $ 5,808,654.55 |
| Wells | 6,196 | $ 1,549,100.76 |
| | 67,145 | $15,669,553.48 |
| Total | 373,201 | $86,243,594.59 |

78.     The vast majority of the aforesaid selling occurred on or before September 1, 2011, the date on which it was announced after the market closed that the Starz distribution deal would not be renewed.  In fact, Director Defendant Giancarlo sold 2,514 shares of Netflix at $234.53 per share on September 1, 2011; Director Defendant Hastings sold 5,000 shares of Netflix at $234.53 per share on September 1, 2011; and Executive Defendant Hunt sold 1,589 shares of Netflix at $234.53 per share on September 1, 2011.

79.     The use of adverse non-public information about the financial condition and operations of the Company for the personal gain of the Individual Defendants constituted breaches of their fiduciary duties of good faith, loyalty, and fair dealing.

80.     The members of the Audit Committee breached their fiduciary duties as members of that committee in that they utterly failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the directors and officers of Netflix, particularly Individual Defendant Hastings and Wells, from violating or acting in contravention to applicable laws, rules and regulations regarding financial disclosure and/or intentionally and/or recklessly failed to detect and/or encouraged and/or aided and abetted misconduct by the Individual Defendants.  They also drafted, produced, reviewed, and/or disseminated the materially false and misleading statements and information alleged herein and/or were aware, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company during the Relevant Period in violation of their fiduciary duties of good faith, loyalty, fair dealing, and candor. The members of the Audit Committee also breached their fiduciary duties of good faith, loyalty, and

fair dealing by intentionally and/or recklessly failing to institute a special investigation against the Individual Defendants for their violations of applicable securities laws and regulations and/or breaches of their fiduciary duties. In addition, two of the three members of the Audit Committee, Director Defendants Giancarlo and Haley, personally profited from their breaches of fiduciary duties by selling large amounts of personally-owned Netflix stock at artificially inflated prices and reaping enormous profits thereby in violation of their fiduciary duties of good faith, loyalty, and fair dealing.

## DAMAGE TO THE COMPANY

81.     Netflix suffered severe and irreparable harm as a result of the breaches of fiduciary duties by the Individual Defendants. Such damages include the institution of the Securities Fraud Action, the cost of defending the action, and any amounts paid by the Company pursuant to a judgment against it or a settlement of the action.

82.     As a result of the Individual Defendants' breaches of their fiduciary duties, the Company's common stock traded at artificially inflated prices during the relevant period. The Company suffered a severe decline in its market capitalization as a result of the Individual Defendants' breaches of their fiduciary duties when the truth about its financial condition was revealed. The Company's price per share was $181.56 on January 25, 2011, the last full day of trading before the start of the Relevant Period. It closed at $77.37 on October 25, 2011, the day after the end of the Relevant Period, a decline of 57% in exactly nine months. In comparison, the NASDAQ Composite Index declined less than 3% during the same period.

83.     The breaches of fiduciary duties by the Individual Defendants caused the Company a significant loss of customers, adverse publicity, ridicule, and a loss of good will. As stated in the 2011 Form 10-K:

> **If we are unable to continue to recover from the negative consumer reaction to our price change and other announcements made during the third quarter of 2011, our business will be adversely affected.**
>
> In the third quarter of 2011, we made a series of announcements regarding our business, including the separation of our unlimited DVD-by-mail and unlimited streaming plans with a corresponding price change for some of our customers, the rebranding of our DVD-by-mail service, and the subsequent retraction of our plans to rebrand our DVD-by-mail service. Consumers reacted negatively to these announcements, adversely impacting our brand and resulting in higher than expected customer cancellations. These adverse effects, coupled with the increasingly long-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

term and fixed-cost nature of our content acquisition licenses, will likely continue to have an adverse impact on our results of operations. While we have seen a return to growth in our core domestic streaming segment, we believe the process of repairing our brand will take time. If we are unable to continue to repair the damage to our brand, our results of operations, including cash flow, will be adversely affected.

84.     During the Relevant Period, the Company repurchased more than $200 million of its own shares at artificially inflated prices under its stock repurchase program.  Some of these shares were repurchased at the grossly inflated price of $283.06 per share.  Executive Defendant Wells justified the repurchase program during a conference call with analysts on July 25, 2011, on the basis that "a buyback is *the most efficient way*" to returning money back to investors while maintaining a 14% domestic operating margin.  (emphasis added).  This was an intentionally false and misleading statement, because Netflix closed at the artificially inflated price per share of $281.53 on July 25, 2011, meaning the Company was overpaying to repurchase its shares, and because it had borrowed funds at 8.5% interest in order to have the cash to repurchase the shares.  Because of the Individual Defendants' breaches of their fiduciary duties of loyalty, good faith, and fair dealing, the Company spent more than it otherwise would have had to repurchase the equivalent number of shares or could have repurchased more shares for the same price if its stock price had not been artificially inflated, and borrowed money at a high rate of interest to enable the repurchasing of its stock.

85.     In addition, the repurchase plan at artificially high prices served to benefit the Individual Defendants to the detriment of the Company, because it artificially inflated the prices they were able to obtain upon their sales of Company shares.  The actions of the Individual Defendants, putting their personal interests ahead of those of the Company and its shareholders, constituted breaches of their fiduciary duties of loyalty, good faith, and fair dealing.

86.     On September 21, 2011, the *Wall Street Journal's* Martin Peers had the following to say about the Company's stock repurchase program:

Netflix's party is over. Now comes the hangover, *not least from the legacy of its aggressive stock repurchases.*

*Few fast-growing Silicon Valley companies buy back shares, preferring to hoard whatever cash they generate to fund expansion. Not Netflix.* Between the start of 2007 and June 30 of this year, Netflix generated $507 million in free cash flow. Yet, over that same period, as the company's stock soared, it spent $994 million buying

back shares. Netflix notes its average cost was $43 a share, well below the current price of about $130, *although it paid an average of $238 in the second quarter.*

*To help cover the cash gap, Netflix issued $200 million in bonds, on which it is paying 8.5% interest.* So it finished June 30 with $176 million in net cash and short-term investments, down from $400 million at the end of 2006.

Netflix might regret this spending in the next year or two. The decision to separate its DVD-by-mail and streaming services seems likely to accelerate subscriber defections even faster than the company forecast last week. That will hurt revenue at the very time Netflix needs it most. Aside from its costly international expansion, Netflix had $2.4 billion in future commitments to license content for its streaming service as of June 30. And Netflix faces deep-pocketed rivals such as Google and Amazon.com in online video.

What did Netflix gain from the buybacks? Well, *by helping fuel the stock rally, they made employee stock options more valuable. Chief Executive Reed Hastings, for instance, has been a steady seller through a prearranged trading program, exercising options as low as $1.50 for as much as $262 a share. If Netflix finds itself short of cash in the near future, it could ask Mr. Hastings for help.*

(Emphasis added).

87.    Thus, the Individual Defendants not only lined their own pockets through the Company's stock repurchase program during the Relevant Period, they caused the Company to borrow money at 8.5% interest to fund their self-dealing, in violation of their fiduciary duties of good faith, loyalty, and fair dealing.

## DERIVATIVE AND DEMAND ALLEGATIONS

88.    Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

89.    Plaintiff brings this action derivatively in the right and for the benefit of Netflix to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants.

90.    Plaintiff will adequately and fairly represent the interests of Netflix and its shareholders in enforcing and prosecuting its rights, and she has retained counsel experienced in litigating these types of actions.

91.    At the time this action was initiated, the Board was comprised of the following eight Director Defendants:  Barton, Battle, Giancarlo, Haley, Hastings, Hoag, Kilgore, and Mather.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Plaintiffs have not made any demand on the Board to institute this action because such a demand

2  would be a futile, wasteful and useless act, for the reasons set forth below.

3    92.    Director Defendant Hastings has clearly demonstrated his hostility and/or inability to

4  act in compliance with his fiduciary obligations and/or to sue himself and/or his fellow directors and

5  allies in the top ranks of the Company for the violations of law complained of herein, as well as his

6  hostility to the relief sought in this action. Hastings is the Chairman, President, and CEO of Netflix,

7  and thus is the consummate "inside" director. As an inside director, Hastings has and continues to

8  receive considerable remuneration for his work as an officer of the Company, earning a total of

9  approximately $5.5 million for his services as an officer in 2010. He thus lacks disinterest for the

10  purpose of considering a demand on the Board.

11    93.    Director Defendants Hastings and Kilgore are named defendants in the Securities

12  Fraud Action. Any decision to pursue the instant litigation substantially increases their potential for

13  liability in the Securities Fraud Action, making them unable to consider a demand in the present

14  matter with disinterest, given the interrelationship of facts and issues in the two cases.

15    94.    Director Defendants Barton, Battle, Giancarlo, Haley, Hastings, Hoag, and Kilgore

16  each sold between 7,500 and 190,000 shares of Netflix common stock during the Relevant Period at

17  artificially inflated prices, and reaped proceeds ranging from $1,942,890.00 to $43,252,600.00. Not

18  only that, the Director Defendants realized enormous profits on these sales. For example:

19    •    On July 27, 2011, Director Defendant Barton sold 9,260 shares at $271.68 per share,
    for a total of $2,613,561.60. He paid between $17.16 and $26.29 per share to acquire these shares
20  through the exercise of stock options (Form 4 filed with the SEC on July 29, 2011);

21    •    On July 11, 2011, Director Defendant Battle sold 1,500 shares at $300.00 per share,
    for a total of $450,000.00. He paid a combination of $28.13 and $29.60 per share to acquire 1,000 of
22  these shares through the exercise of stock options (Form 4 filed with the SEC on July 11, 2011);

23    •    On June 1, 2011, Director Defendant Giancarlo sold 1,815 shares at $269.23 per
    share, for a total of $488,652.45. He paid $22.04 per share to acquire these shares through the
24  exercise of stock options (Form 4 filed with the SEC on June 2, 2011);

25    •    On January 28, 2011, Director Defendant Haley sold 20,398 shares at $211.28 per
    share, for a total of $4,309,689.44. He paid between $17.16 and $29.46 per share to acquire these
26  shares through the exercise of stock options (Form 4 filed with the SEC on January 31, 2011);

27    •    On July 14, 2011, Director Defendant Hastings sold 5,000 shares at $299.50 per
    share, for a total of $1,497,500.00. He paid $1.50 per share to acquire these shares through the
28  exercise of stock options (Form 4 filed with the SEC on July 14, 2011);

- 26 -

1

2

3

•      On July 28, 2011, Director Defendant Hoag sold 4,510 shares at $267.81 per share, for a total of $1,207,831.22. He paid between $101.99 and $267.26 per share (the latter price for only 187 shares) to acquire these shares through the exercise of stock options (Form 4 filed with the SEC on August 1, 2011);

4

5

•      On May 2, 2011, Director Defendant Kilgore sold 29,011 shares at $238.22 per share, for a total of $6,911,000.42. She paid between $53.48 and $75.00 per share to acquire these shares through the exercise of stock options (Form 4 filed with the SEC on May 4, 2011).

6      95.      As discussed above, Director Defendants Barton, Battle, Giancarlo, Haley, Hastings,

7 Hoag, and Kilgore willfully and intentionally and/or recklessly violated their duties of loyalty, good

8 faith, and fair dealing by reaping substantial profits on the sale of Netflix stock through (a) the

9 failure to disclose or the affirmative misrepresentation of material adverse facts made intentionally,

10 in conscious disregard of the truth, and/or in reckless disregard of the truth; (b) the knowledge and

11 use of adverse non-public information about the financial condition and operations of the Company;

12 (c) the initial authorization and/or continuing approval of the Company stock repurchase plan which

13 repurchased over $200 million of Netflix shares at inflated prices and further drove up the price of

14 the Company's shares; and/or (d) the use of the Company as a piggy bank to fund the stock

15 repurchase program, borrowing funds at 8.5% interest to finance the program.

16      96.      Because Director Defendants Barton, Battle, Giancarlo, Haley, Hastings, Hoag, and

17 Kilgore consciously and willfully and/or recklessly engaged in, and permitted others at the

18 Company, including Executive Defendants Hunt, Sarandos, and Wells, to engage in, the illicit

19 conduct described above, and directly and personally profited thereby at the expense of the Company

20 and its shareholders, they each face a substantial likelihood of liability for their conscious and willful

21 and/or reckless breaches of fiduciary duties, and any demand upon them, a majority of the Board is

22 futile.

23      97.      During the Relevant Period, Director Defendants Giancarlo, Haley, and Mather

24 served as members of the Audit Committee. They consciously and willfully and/or recklessly

25 breached their fiduciary duties of loyalty and good faith, because the Audit Committee, *inter alia*,

26 allowed or permitted false and misleading statements to be disseminated in the Company's SEC

27 filings and other disclosures and utterly failed to ensure that adequate internal controls were in place

28 to prevent such disclosures.

98.   The members of the Audit Committee are responsible for "instituting special investigation(s) and, as appropriate, hiring special counsel or experts to assist in such investigation(s)." They breached their fiduciary duties of good faith, loyalty, and fair dealing by consciously and willfully and/or recklessly refusing or otherwise failing to initiate such an investigation regarding the breaches of fiduciary duties committed by the Individual Defendants, including themselves.  Moreover, demand is futile with respect to the members of the Audit Committee because they each face a substantial likelihood of liability for their conscious and willful and/or reckless breaches of fiduciary duties for failing to initiate an investigation against their fellow Individual Defendants and themselves.

99.   Thus, for the reasons set forth above, none of the Director Defendants can consider a demand with disinterest and independence, and demand upon the Board is excused as futile.

## COUNT I

### Against All Individual Defendants for Breach of Fiduciary Duty
### for Disseminating False and Misleading Information

100.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.   As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to ensure that Netflix disseminated accurate, truthful and complete information to its shareholders.

102.   The Individual Defendants violated their fiduciary duties of loyalty, good faith, fair dealing, and candor by intentionally and willfully and/or recklessly making, causing or allowing the Company to disseminate to its shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, and other public statements and disclosures as detailed herein. In addition, the Individual Defendants were aware of, and intentionally and willfully and/or recklessly disregarded, the misleading and inaccurate statements, and were aware of, and deliberately and/or recklessly disregarded, their materially false and misleading nature.  These actions could not have been a good faith exercise of prudent business judgment.

103.   The Individual Defendants violated their fiduciary duties of loyalty, good faith, fair dealing, and candor by profiting from the sale of their own Netflix stock at artificially inflated prices

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  due to their materially misleading statements and omissions, their improper use of non-public

2  Company information, the Company stock repurchase program at artificially inflated prices, and

3  their causing the Company to borrow money at 8.5% interest to finance the stock repurchase

4  program.  These actions could not have been a good faith exercise of prudent business judgment.

5       104.  As a direct and proximate result of the Individual Defendants' foregoing breaches of

6  fiduciary duties, the Company has suffered damages, as alleged herein.  As a result of said breaches,

7  the Individual Defendants are liable to the Company.

8       105.  Plaintiff, on behalf of Netflix, has no adequate remedy at law.

9                                   **COUNT II**

10          **Against All Individual Defendants for Breach of Fiduciary Duties**

11                    **for Failing to Maintain Internal Controls**

12       106.  Plaintiff incorporates by reference and realleges each and every allegation set forth

13  above, as though fully set forth herein.

14       107.  As alleged herein, each of the Individual Defendants had a fiduciary duty to, among

15  other things, exercise good faith to ensure that the Company's financial statements were free from

16  material misrepresentations and omissions, and when put on notice of problems with the Company's

17  business practices and operations, to exercise good faith in taking appropriate action to correct the

18  misconduct and prevent its recurrence.

19       108.  To this end, the Individual Defendants had a duty to implement and maintain

20  appropriate internal controls to prevent and correct the dissemination of material misrepresentations

21  and omissions.

22       109.  The Individual Defendants consciously and willfully and/or recklessly ignored the

23  obvious and pervasive problems with the Company's internal controls and practices and procedures

24  and failed to make a good faith effort to correct these problems or prevent their recurrence.

25       110.  As a direct and proximate result of the Individual Defendants' foregoing breaches of

26  fiduciary duties, the Company has sustained damages, as alleged herein.  As a result of said

27  breaches, the Individual Defendants are liable to the Company.

28       111.  Plaintiff, on behalf of Netflix, has no adequate remedy at law.

**COUNT III**

**Against All Individual Defendants for Breach of Fiduciary Duties**

**for Failing Properly to Oversee and Manage the Company**

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    The Individual Defendants owed and owe Netflix fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe the Company the highest obligation of good faith, fair dealing, and loyalty.

114.    The Individual Defendants, and each of them, consciously and willfully and/or recklessly violated and breached their fiduciary duties of loyalty, reasonable inquiry, oversight, good faith and supervision.

115.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Netflix has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

116.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

117.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

**COUNT IV**

**Against All Individual Defendants for Unjust Enrichment**

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of the Company.  As described herein, all of the Individual Defendants, except for Individual Defendant Mather, earned substantial profits on the sale of the personally-owned Netflix shares at prices that were artificially inflated as a result of their misconduct.

120.    Plaintiff, as a shareholder and representative of Netflix, seeks restitution from the Individual Defendants on behalf of the Company, and each of them, and seeks an order of this Court

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and

2 | each of them, as a result of their wrongful conduct and fiduciary breaches.

3 |      121.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

4 | ### COUNT V

5 | ### Against All Individual Defendants for Abuse of Control

6 |      122.    Plaintiff incorporates by reference and realleges each and every allegation contained

7 | above, as though fully set forth herein.

8 |      123.    The Individual Defendants' conscious and willful and/or reckless misconduct alleged

9 | herein constituted an abuse of their ability to control and influence the Company, for which they are

10 | legally responsible.  In particular, they consciously and willfully and/or recklessly abused their

11 | positions of authority by making material misrepresentations and/or causing or allowing Netflix to

12 | misrepresent material facts regarding its financial position and business prospects.

13 |      124.    As a direct and proximate result of the Individual Defendants' abuse of control,

14 | Netflix has sustained significant damages.

15 |      125.    As a result of the conscious and willful and/or misconduct alleged herein, the

16 | Individual Defendants are liable to the Company.

17 |      126.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

18 | ### COUNT VI

19 | ### Against All Individual Defendants for Gross Mismanagement

20 |      127.    Plaintiff incorporates by reference and realleges each and every allegation set forth

21 | above, as though fully set forth herein.

22 |      128.    The Individual Defendants had a duty to Netflix and its shareholders to supervise,

23 | manage and control prudently the operations, business, and internal financial accounting and

24 | disclosure controls of the Company.

25 |      129.    The Individual Defendants, by their actions and by engaging in the conscious and

26 | willful and/or reckless wrongdoing described herein, abandoned and abdicated their responsibilities

27 | and duties with regard to managing prudently the businesses of Netflix in a manner consistent with

28 | the duties imposed upon them by law. By committing the misconduct alleged herein, the Individual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Defendants consciously and willfully and/or recklessly breached their duties of diligence and candor

2  in the management and administration of the Company's affairs and in the use and preservation of its

3  assets.

4        130.   During the course of the discharge of their duties, the Individual Defendants knew of

5  the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants

6  caused Netflix to engage in the scheme complained of herein, thus breaching their duties to the

7  Company. As a result, the Individual Defendants grossly mismanaged Netflix.

8        131.   Plaintiff, on behalf of Netflix, has no adequate remedy at law.

9  **COUNT VII**

10  **Against All Director Defendants for**

11  **Waste of Corporate Assets**

12        132.   Plaintiff incorporates by reference and realleges each and every allegation contained

13  above, as though fully set forth herein.

14        133.   As a result of the conscious and willful and/or reckless misconduct described above,

15  and by consciously and willfully and/or recklessly failing to properly consider the interests of the

16  Company and its public shareholders, the Director Defendants caused Netflix to squander

17  irrationally its corporate assets by engaging in a stock repurchase program at artificially inflated

18  prices and to borrow money at a high rate of interest to finance the repurchase program. The stock

19  repurchase program as implemented by the Director Defendants was part of a scheme to drive up the

20  price of Netflix stock for the personal benefit of the Individual Defendants, and served no legitimate

21  corporate purpose.

22        134.   As a result of this conscious and willful and/or reckless waste of corporate assets, the

23  Individual Defendants are liable to the Company.

24        135.   Plaintiff, on behalf of Netflix, has no adequate remedy at law.

25  **PRAYER FOR RELIEF**

26      WHEREFORE, Plaintiff demands judgment as follows:

27        A.   Against all Individual Defendants and in favor of the Company for the amount of

28  damages sustained by the Company as a result of the Individual Defendants' conscious and willful

- 32 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | and/or reckless breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and other

2 | wrongdoing;

3 |      B.     Directing Netflix to take all necessary actions to reform and improve its corporate

4 | governance and internal procedures to comply with applicable laws and to protect the Company and

5 | its shareholders from a repetition of the damaging events described herein.

6 |      C.     Awarding to Netflix restitution from the Individual Defendants, and each of them,

7 | and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual

8 | Defendants;

9 |      D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable

10 | attorneys' fees, accountants' and experts' fees, costs, and expenses; and

11 |      E.     Granting such other and further relief as the Court deems just and proper.

12 | **JURY DEMAND**

13 |      Plaintiff demands a trial by jury.

14 | DATED: March 26, 2012           **GREEN & NOBLIN, P.C.**

15

16 |           By: _____

17 |           Robert S. Green

18 |           James Robert Noblin
          595 Market Street, Suite 2750
          San Francisco, California 94105

19 |           Telephone: (415) 477-6700
          Facsimile: (415) 477-6710

20

21 |           *Attorneys for Plaintiff*

22

23 | OF COUNSEL:

24 | **LAW OFFICE OF DEBORAH S. GOODMAN P.C.**
Deborah S. Goodman

25 | 1301 Skippack Pike
Suite 7A #133

26 | Blue Bell, PA 19422
Tel.:    (610) 277-6057

27 | **RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky

28

- 33 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | Brian D. Long
Gina M. Serra
2 | 919 North Market Street, Suite 980
Wilmington, DE 19801
3 | Tel.:  (302) 295-5310
Fax:  (302) 654-7530
4 |
5 |
6 |
7 |
8 |
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Mary Davis, hereby declare, under penalty of perjury as follows:

I am the plaintiff in the above-captioned shareholder derivative action. I have read the foregoing shareholder derivative complaint (the "Complaint") and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: March 21, 2012          _____
                                MARY DAVIS